I'm representing Petitioner Bica in this case. We're asking the Court to reverse the decision of the Board of Immigration Appeals and grant her application for political asylum. First of all, I'd like to address the credibility finding made by the immigration judge and the lack of credibility finding made by the Board of Immigration Appeals. It is Ms. Bica's, it's our position that Ms. Bica testified credibly in her hearing before the immigration judge. The immigration judge found several inconsistencies which we would submit to the Court under the substantial evidence test were not material to her claim for political asylum. He found inconsistencies with respect to her employment, her housing, and points of inconsistencies pointed out by the trial counsel at the time with respect to her applications for political asylum. We would submit that with respect to her employment in Albania, she did testify both on direct and cross-examination that she was, in fact, employed in coal storage and vegetables and farming. The timeframe that he found inconsistent was whether or not she'd been employed for months or years, and we would submit that's irrelevant to her claim for political opinion or persecution based on political opinion. I mean, even, even without regard to whether she had made out a claim for passive persecution, and assuming she did, why wouldn't the presumption be overcome by the country conditions? It's our position that the country conditions haven't changed, that the government hasn't shown that they have changed significantly to warrant the rebuttal of that presumption. Ms. Bita also testified that she believes that even after the elections took place in Albania, and the country reports do indicate this, there were some fraud and intimidation involved in future elections that took place after. There were a number of elections, right? Correct. There was a regime change in 92. That's correct. And then there was another regime change in... 96-97. 96-97. Those elections were marred with fraud and not recognized. That's what the country reports also indicate in the State Department profile. And was that covered by the country report? Was that discussed in the country report? It was discussed in the country report and also pointed out in our opening brief that there were places in the State Department profile in the country report that said that the 1996-97 elections were marred with fraud and intimidation. And there was some hint that questioned the validity of those elections. And it was her party that won them, wasn't it? I'm sorry? Her party won in that turn of elections. The Democratic Party won, but apparently after that time, the Socialist Party... The tampering that they found at the time, if any, was taken by her party, because her party was the Victoria's Party. Is that correct? That could be one inference, Your Honor. Well, it could be one inference, but I'm just reading the country report. You said the country report says, yes, there was some fraud in the elections. I'm just asking, it says there was some fraud in the elections on behalf of her party, and her party won. Correct? Correct. Okay. So her party won. But then after that, there was the change in, again, to where the party did, in fact, lose. Well, I don't know the Socialist Party when I understand this, but I don't see anything besides her. It sedicts it. Well, the Socialists are just as bad as the Communists at the end. Her testimony indicates that she believes them to be... I know. She says, I believe Socialists are as bad as Communists. And a lot of people think Socialists are, in general, as bad as Communists, but that's another question. How does that become any kind of substantial evidence in this record? All she says is, I think they're just as bad as the other guy. That's it. And that's... And you're saying that's enough to overcome the country report, which says the Communists, who are presumably the ones who did this persecution, assuming it was persecution, the people who did it were the Communists, they're out of power. They're actually being prosecuted, many of them, for the things they did while they were in power. And this other party is in power now. And people are not being essentially persecuted on those bases. She says, oh, well, I think Socialists are as bad as Communists. Is that enough for us to say we overturned this decision on the basis there's no substantial evidence to support it? Which is our standard, I take it. I would submit that her belief on that is part of the test. It's subjectively reasonable for her to believe that. Didn't she testify that she was, that the requirement that she report to the police once a month continues to 95? Yes, she did testify. Which would have survived at least the one change in regime. That's correct. And in fact, her reporting requirement. And the visits to the police station were something that started on the Communists. Correct. And her reporting to the police station occurred until she departed that country for the United States. So she had been reporting for over 10 years on a monthly basis to the police department,  And she testified that the practice or the requirement that she report to the police stemmed out of the incident in the jail when her husband was. That's correct. Her husband was apparently arrested and jailed when upon she went to visit him. She was told by the jail, the guards at the jail not to come anymore. And she apparently voiced a political opinion by the statements and the actions she took. So you're arguing that she actually has a objective base, if you believe her, an objective basis for believing that the change in elections didn't have an effect on persecution by the government. That's correct. I thought so. I thought that's what you were arguing. But she was being persecuted by the communists because of being a member of the party, I think, that ultimately didn't have power at the time. Correct. But as his Honor pointed out, she did have to continue to report even after her party won the elections and followed the communist regime. Maybe her party wasn't as good as she thought it was. I'm sorry? Maybe her party wasn't as good as she thought it was. OK. Additionally, based on what she has witnessed, to speak, experienced over the course of her life with the death of her father at the hands of the communists, the death of her 10 brothers at the hands of the communists. Can you tell me a little bit? She came to the United States in 97. 1996. She applied for political asylum. I thought that I had read in the IJ decision that he said that she got a passport in 95 but didn't get her exit visa till 97. I believe that was an error. The documents and evidence show that she entered the United States in 1996. 96. Correct. So she and she entered on a B-1 or something? B-2 visitor visa. Six months to stay in the United States. And she exceeded her visa. Correct. And how did the INS find her? Well, it's normal. Her cousin died, right? She was with a cousin who died. Normal process is when her cousin died, she applied for political asylum affirmatively before the INS. Apparently, she went to the INS to normalize her status. It was one of those things where they picked her up. That's correct. And apparently had an interview with the INS asylum officer at that time who made a decision on her case and referred the case to the immigration judge on the notice to appear. Then she had her hearing before the immigration judge, and the immigration judge subsequently denied her application for political asylum. As I was saying, given the suffering she has experienced with the death of her ten brothers, her father, her husband, the fact that her house was burned down by the communists when she was in Albania, and the record indicates at some point she was actually in the house at the time the house was set on fire. She was 6 or 7 or 11 or whatever, depending on which date we choose, right? Correct. Which one of her dates is accurate? I believe the 19th. Child, right? I believe there was some confusion there when she was a child, but I believe the testimony, given her age, she may have been somewhat confused on the actual year. Okay. Given that, we would also ask that, for humanitarian reasons, that this Court grant her application for political asylum. Your Honors, with respect to the arguments made in Respondent's brief on the jurisdictional issue, we would submit that we, in fact, did raise the credibility issue, and we have, in fact, exhausted our administrative remedies, and therefore this Court does have jurisdiction to hear her appeal. Thank you. We'll hear from the government. Good morning, Your Honors. My name is Tim McNeil, and I appease the Court. The Court should affirm the BIA because the record does not compel the finding either that she was persecuted, that Ms. Bicker was either persecuted in the past or that she has a well-founded fear of persecution, even if what she testified to was true. And that is because the ---- Wait a minute. Even if what she testified was true, she was not persecuted in the past? That the record does not compel that finding. The record may support the finding. I'm sorry. We now believe everything she said, right? And it's really everything she said. Her father was imprisoned and eventually poisoned by the government. Her ten brothers were taken to a camp and shot. She and her mother and sister were in a house that was burned down while they were in it. Her husband was taken away and shot. And when she complained about it, they put her under police surveillance. Police said, you've got to leave your door unlocked so we can come any time. And they did often come in and destroy her property. And they made her come every month to the police station to report humiliating her and grilling her and putting a fear of her safety and life and discontinuing until she left. This is all what she testified. You don't think that's persecution? It may be found to be persecution, Your Honor. But the question to the Court is whether it would compel that finding. Well, if a believer, how would it not compel the finding? Because in the 1940s and 50s, the communists apparently were after her brothers and her father because of their political activity. She and her mother, although they had to flee their house, were not targeted by the communists. Their house got burned down. I mean, they owned the house at that point, and the government burned the house. Yes. That's not presumably they burned the house because the brothers and the fathers were in jail at the time. They were living in the house. You don't think that's persecution against them? I think it may be found. I'm sorry, no? I think it may be found. An immigration judge or the BIA could have made that finding. And that evidence would support that finding. But the question is, does that compel the finding? Because she was a child at the time. Because after that, because her brothers and her father were what brought the communists, brought that family within the target of the communists. And because she lived in Albania for some decades after that happened. So if they persecute the family of somebody who is being persecuted for political, then the family is not being persecuted. Pardon me, Your Honor. Is that what you're saying? No, Your Honor, I'm not. I mean, let's say they're trying to persecute the father and the brothers. And the way they're going to do it is by burning down the house that the mother and the two sisters live in. You don't think that is persecution? That that's only persecution of the father?  I don't know. Again, Your Honor, with respect, I'm not saying that. I'm saying an immigration judge or the BIA could have found that. But that on appellate review, the question is, does the evidence compel that finding? Could a reasonable fact finder not have failed to find that? And even if this Court ---- But when you say finding, you're talking about facts. Yes. You're not talking about legal conclusions. And I've given you all the facts. I've given you sort of all the historical facts. And I'm sort of wondering, I mean, it's not like saying, you know, you can find the light was red, the light was green. How would ---- Because the question is whether the evidence is so compelling that no reasonable fact finder could have failed to find persecution. And in one of the Krasad cases, 47-3 at 340, this Court held that attacks on family members do not necessarily establish a well-founded fear of persecution absent a pattern of persecution tied to the petitioner. Now, what I was addressing, Your Honor ---- Okay. So add that on the 10 years of having to report to the police. Yes. That is not related to what happened in the 40s and 50s. That is related to what her husband was doing and what she did. We don't know. I mean, the governments have long memories. They might say, oh, you know, she's now married to a guy who's an anti-communist. She was a daughter of an anti-communist. She had ten brothers who were anti-communists. And therefore, we will treat more harshly the incident in the jail. But again, Your Honor, the evidence does not compel that finding. The evidence only compels the finding if what she said was true, that her husband was involved in political activities some decades after her family had been targeted, and that she was only targeted when she went to the police station to inquire about her husband. The record does not compel that finding. Well, I realize that going to the police station to inquire about her husband was an unusual and strange and unexpected thing for her to do, and that's why the government would target her. But again, it doesn't compel the finding. I thought they grabbed her and targeted her because she spit on him and screamed at him and et cetera, et cetera. Yes, she cursed them because she was not able to get information about his statement. Because they said, don't come back. He's already been shot. Right. And she's supposed to say, thank you very much. I appreciate the information. I'll just go home and act like nothing happened. No, Your Honor. I do not begrudge her outrage at what happened to her husband. But the question is whether the record compels the finding. She did also testify, did she not, that her husband worked with anti-communists and that she worked with the women, he worked with the men. Yes. But all that happened to her, and it's not to belittle it, but what happened to her in 1980 after she went to see about her husband does not compel the finding that she was persecuted. This court in Corisani, 208 Fed Third at 1100, said that even repeated brief detentions are not persecution. In that case, there were many things that went on with the applicant. But the applicant himself was the target of the ‑‑ there was no severe or serious physical harm to that applicant. But, and in this case, there is no evidence that compels the conclusion that she was, that Ms. Baker was seriously harmed while she was in detention, that 10‑day detention. And the monthly reporting requirement, too, it does not compel a conclusion that she was persecuted. It compels the conclusion that she was harassed, but harassment does not necessarily constitute persecution. And with regard to whether ‑‑ Where is the dividing line? It is a ‑‑ it can be a close line, but it's not passed in this case. And that is the point of the compelling evidence standard, that reasonable fact finders ‑‑ It's not what the I.J. said, however. What the I.J. said is, well, for all I know, everybody in Albania was being asked to come to the police station once a month. He didn't say this wasn't severe enough to be persecution. He said she just hasn't shown that she's any different from anybody else. Yes. Which is sort of a little strange. I also thought it was a little strange for him to say it's not absolutely clear, as if she has to show things by absolute clarity. I found that a little strange. Yes. That was a poor choice of words. But that ‑‑ He said it twice. Yes. And we can read that as his not understanding precisely what she was testifying to. Well, maybe he didn't know the law. Maybe the way to read it is that he misapplied the law, that he misunderstood the legal standard, and that he certainly did not do what you are now claiming he did, which is say, look, this is bad, but it's not persecution. It's mere harassment. What he says is she hasn't shown that everybody in the country is similar, you know. She doesn't say she was singled out for that, although she did testify quite specifically that the reason these things started was because of the incident in the jail. Yes, Your Honor. I didn't mean to imply that the immigration judge said that what happened to her was not persecution. Well, but you're here sort of making up reasons why we ought to defer to the I.J. It's one thing if we're convinced that the I.J. applies the correct legal standard and understands it and applies it, and we say, well, you know, maybe we disagree with the way he applies it. But the I.J. clearly said the wrong thing. No, it's not clear that he did, Your Honor. Well, tell me. He said it's ‑‑ It is clearly not the test. It is clearly not of a petitioner to prove that she was singled out, that everybody else in the country was treated the same way. For purposes of a well‑founded theory of persecution, it is, but not for past persecution, yes, Your Honor. For past persecution, right? Yes. She just shows what happened to her. And the fact that she hasn't sort of disproved that the same thing happened to a lot of other people, that's not her burden. Yes. So he goofed in that. Yes, he did. So the one thing that you now are relying on, his determination that she was not persecuted in the past, he applied the wrong standard. And you're trying to make up for him, but that's not what he was doing. I'm not only relying upon that, Your Honor. But I know you're specifically not relying on it. You're overlooking what he actually did. No, I'm agreeing with you, Your Honor, that that statement is an incorrect application. And when the BIA said we adopt what he did, it was wrong. Yes. On that, it was, Your Honor. So why isn't the appropriate thing to do in a circumstance like this is to send them back and say, hey, guys, do it right? Because there is no, even if that were persecution, Your Honor, that was something that happened in 1995. But you just spent time here arguing it was not persecution. You said it was mere harassment. Okay. Are you withdrawing that argument now? No. Well, okay, let's talk about it. Don't shift the ground on me. You know, you said this is not persecution. This is mere harassment. And this whole discussion we're having is that the I.J. did not follow this line of analysis. His determination of lack of persecution was not based on the argument you are making now. It was based on an erroneous one. So either you say you're right, his finding of lack of persecution was erroneous, or you can persuade me that even though he said the wrong thing, we need to defer to him. Yes. And the reason the Court needs to defer to the immigration judge, not for the reason that he said, but because the evidence does not compel a contrary conclusion that she was persecuted. Well, but you will agree with me, will you not, that if the I.J. gets to his conclusion by what is clearly an erroneous path, we cannot defer to it because we can imagine a correct path. You must agree with that because we don't know what he would have done had he understood the correct legal standard. Right. But in an asylum case, there is also the requirement that there be, even if there is persecution, that there be, there is a presumption that there's a well-founded fear of persecution that can be rebutted. And in this case, there is substantial evidence that there was a change, even at that time, Your Honor. Even she says on page 6 of her brief to this Court that she felt in September 1995, when her reporting requirement ended, that she felt was secure enough to obtain a visa from the Albanian government. That was not even the Albanian government she claims to fear now. So even the people she – What she claims is things have gotten worse. The Democrats were in power for a while. Now it's the socialists. Yes. And what does the country report tell us about the socialists? It does. Tell me what it says. It says that the socialists won in June of 1997. It doesn't – Does it say how they differ from the – No, Your Honor. And it doesn't mean – It's a burden, of course, of the government to show that she has persecution. It's a burden to say – to show that the fear does not continue because the change is material and the change is such that it would rebut the presumption of continued persecution. What is it in the country report that does that? The fact that since 1990, not only did the communist regime disintegrate, but there were several elections culminating in the 1997 election of the socialists. There is no requirement that the INS prove that the socialists are not the communists. This Court only last month – But what you have to prove, what you have to rebut is a presumption of continued persecution. You have to show that the change has been a change for the better. And just saying we've had a bunch of elections of a new regime strikes me as not being good enough. It is – This is the kind of regime that, in fact, does better things. It is in a case like this, Your Honor, and this Court found similarly in a Ukrainian case last month, which the citation to which I gave the – I have it here. I have it here. This is – this is Legulko? Yes, Your Honor. And in that case, the Court said that a mere fear of return to communist – return of communist rule is – while subjectively genuine, perhaps, is not objectively reasonable and does not compel the conclusion – Was the Ukrainian government socialist? No. But that is not enough, Your Honor. It is not enough – an election of a socialist party, it does not compel the conclusion that a victim of communist persecution has an objectively well-founded fear of the same type of persecution. Communists are not necessarily socialists. There is nothing that compels that conclusion. That may be something that Ms. Bicca believes. In fact, Ms. Bicca testified that she didn't even know what was going on in Albania when she testified before the immigration judge. I've gone through what she went through. I probably want to not hear anything more about Albania for the rest of my life. Anyway, and – and with regard to – with regard to the request we just heard for humanitarian relief, that is the first time that that has been raised. That was not – that not suggested before the immigration judge or the BIA or in the briefs to this Court. The BIA – didn't the – didn't the IJ say it in his decision she's not eligible for the – So it must have been raised. What Ms. – no, Your Honor. What Ms. Suddivaraj – Suddivaraj requested was that this Court grant humanitarian relief. Oh, humanitarian relief. And that is the first time we have heard that in this case. And that is not something that, pursuant to the Supreme Court's decision in Ventura, that the – that this Court would have the – have jurisdiction to do. Well, what she'd do, she'd have to go to the BIA and move to reopen there? Yes. Can she still do that? No. But – but the fact – it would have to be brought first to the Board of Immigration Appeals or the immigration judge. Whether – I don't think that she could do that at this late stage, say that I'm – I should be granted humanitarian relief. But it could not be done in the first instance by this Court. Can you spend a minute discussing the IJ's capability findings? Yes. There were three things that the – that the immigration judge talked about. One was what the immigration judge – immigration service had noted, which was a discrepancy between the application and her testimony. The discrepancy there is that she said in 1980 she was detained – she testified that she was detained for 10 days. She wrote in her supplemental asylum application that she was detained for two months. Then she said when she left that 10-day detention – this was in her testimony – that she – that she lived alone. But then a page later in the testimony, she said that she – she rented a room with a – living in a house with other people. And she also said that she had worked all her life, but then she said that when she was released, she didn't work for six to seven years. The – where she lived and where she worked is relevant to the heart of that 1980 asylum claim – the claim about persecution in 1980, because what she was trying to tell the immigration judges because – was that because her husband had been picked up and because she was detained, nobody in Albania would have anything to do with her. If nobody in Albania had wanted anything to do with her, whether she could find work and find housing and where was relevant and did go to the heart of that claim. The immigration judge also relied upon her demeanor. He said that her testimony was evasive sometimes. The transcript reflects that on pages 149 to 50 and 152 to 53 of the administrative record, that she – her own counsel had a very difficult time getting out of her the details of what happened to her brothers, how she knew that her brothers had died, and whether she had herself marched. These are the base numbers? Yes, Your Honor. Well, there's – there's – there are different numbers, administrative record numbers, and – This is transcript on page 18? Give me an example. Give me an example of evasiveness. I mean, the IG didn't really say what it was, so I want your best example of evasiveness. On page 21 of the transcript, that's 152 of the excerpts of the record. Uh-huh. The question was – What line? 14. In the 10 years that you lived with him, her husband, did he participate in any demonstrations against the government? Yes. Question. Okay. How many times? Answer. They demonstrated all the time against the communists. Question. Now, what do you mean by demonstrations? Answer. They were against them. They would raise the whole group and then demonstrate. Question. Give me a sample of what you know as a demonstration. A. Reorganized demonstrations. He protested against the communists. People in groups, they were all against them. Question. Well, did you march in the streets, carry signs? What did you do? Answer. They didn't let us march, but they demonstrated in groups. They tried to hide. It was – there were – it was dictatorship. Question. I know. I am trying to find out. Well, let me ask you this. Were you ever involved in any demonstrations yourself? Answer. I would gather with my friends, with my girlfriends, and go in some basements and try to do some work, articles, things like that. Question. Did you ever march in the street? No. Finally, no. She didn't march in the street. It takes nearly a page of transcript from her – for her own counsel to get from Ms. Baker that she did not – she herself did not march in the streets. That – that itself supports the immigration judges. And this hinges on the word demonstrate. Yes. And to you, the word demonstrate means march in the streets. No, not to me, Your Honor. But her counsel was trying to get from her whether she had marched in the streets, what she meant by demonstrate. And he had a very difficult time getting that from her. So this is an example of evasiveness.  And on pages 149 to 150 of these same excerpts of the instrument, it says, Her counsel tries to – tries to elicit from Ms. Baker the details of what happened to her brothers and how she knows. On line 9. Question. Did you ever see your brothers again after that – after they were in prison? Hey, one more time. I saw them twice altogether. Question. Did you see them anymore after the trial? Answer. Once. Only the younger ones, not the older ones. Question. Do you know if they died in jail? Answer. Yes. We asked for their bodies. They didn't give them to us.   Answer. I swear to God, they died one after the other. Question. Do you know if they died in jail? Answer. Yes. We asked for their bodies.  They died one after the other. They died one after the other. I know that the three older ones, my uncle and his wife, she was pregnant. They were all killed the same day. I can't you – I can't tell you the whole story. Are we just going to sit here and have the entire transcript before the immigration judge read to us? I don't think the Court needs to, Your Honor. It can look at those. These are – these are all evidence that supports the immigration judge's finding that Ms. Baker is not eligible for asylum and reasons that the Court should affirm   It can look at those. These are – these are all evidence that supports the immigration judge's finding Thank you, Your Honor. Thank you. Your  Honor at this time, would you like a minutes for rebuttal? You will not have to take it. I'm sorry? You won't have to take it. But I would like to discuss the eligibility issues? Mrs. Baker would submit that the questions being asked of her, they were being translated to her in her native language. She is not an educated, highly educated woman. And given the language barriers and the translations that were occurring and her lack of education, we would submit to this Court that her answers were not evasive, necessarily, but simply a question of whether or not she fully understood what was being asked of her. We would point to several, the government's counsel has pointed to several inconsistencies apparently in the record. And we would submit that those are based on language difficulties, the difficulties with the translation, and her lack, basically, of education and understanding what's going on in the meanings of the words. Okay. Thank you. Okay. Your Honor, you will stand for a minute. We are adjourned.
judges: Kozinski, Fernandez, Rymer